Filed 3/28/24

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re S.G., a Person Coming Under the Juvenile Court Law. | B330106<br><br>(Los Angeles County Super. Ct. No. 21CCJP02623A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>M.G.,<br><br>　　　Defendant and Appellant. | |

　　APPEAL from orders of the Superior Court of Los Angeles County, Nancy Ramirez, Judge. Affirmed.

　　Jonathan Soglin, under appointment by the Court of Appeal, for Defendant and Appellant.

　　Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

M.G. (mother) appeals from juvenile court orders denying her petition for modification under Welfare and Institutions Code section 388 and terminating her parental rights under Welfare and Institutions Code section 366.26.[1]  Mother contends the proceedings violated her substantive due process rights because the juvenile court was not required to consider her potential, as a teenager, for further brain development, or her capacity to change.  Guided by the California Supreme Court's decision in *In re Marilyn H.* (1993) 5 Cal.4th 295 (*Marilyn H.*), we reject mother's arguments.  We conclude that, even as applied to mother as a teenage parent, sections 366.26 and 388, and the shift in the focus of the proceedings to permanence and stability for the child, did not violate mother's due process rights.

**FACTUAL AND PROCEDURAL BACKGROUND**

In June 2021, the Los Angeles County Department of Children and Family Services (DCFS) detained minor S.G. from mother.  At the time, mother was 17 years old and a dependent of the juvenile court.  DCFS filed a dependency petition alleging S.G. was a person described by section 300, subdivision (b)(1), due to the inability of mother and alleged father S.K.G. to provide two-month-old S.G. with adequate supervision, protection, or regular care.  At the initial hearing, the juvenile court detained S.G.  The court ordered DCFS to provide services to mother and S.K.G., including visitation and a Multidisciplinary Assessment of S.G. and the family to assess "needs and linkage to services."

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

2

DCFS referred mother to an outpatient substance abuse treatment program and scheduled her for an Expectant and Parenting Youth Conference. DCFS also linked mother to drug testing, substance abuse treatment programs, and wraparound services, which included individual and group therapy, psychiatric evaluations, and parenting classes.

In November 2021, the court found true the petition's allegations that mother's marijuana abuse and unaddressed mental health issues placed S.G. at substantial risk of serious physical harm.[2] The court continued the disposition hearing, expressly taking into account that "the statutory scheme tells courts . . . to make special provisions for the barriers facing minor parents." The court noted, for example, that mother "wasn't able to test on a voluntary basis because she's a minor," and that "[s]he is herself a minor who has not had the appropriate family support that she probably should have had."

In January 2022, the juvenile court held a contested disposition hearing. The court acknowledged that mother "is a young parent who is growing up really fast because . . . she's already a parent," and that mother had been forced "to take on more responsibility to take care of not only her baby but also her minor sibling." Nonetheless, the court found DCFS met its burden to show S.G. would be at substantial risk of harm if returned home and ordered him removed from mother's custody. The court ordered DCFS to provide mother family reunification

---

[2] Around this time, a DNA test revealed S.K.G. was not S.G.'s biological father. S.K.G.'s counsel indicated there was no basis for him to assert a claim of paternity. The court made a non-paternity finding and ordered that S.K.G. be stricken from the petition. Mother did not identify any other potential fathers.

services, including individual counseling and drug and alcohol counseling.  The court granted mother unlimited unmonitored visitation at the caregiver's home and up to three hours of visitation per week outside the home.  The court structured the case plan "in the hope . . . that mother will keep visiting more and more, and essentially make a gradual transition to taking care of her child full time."

In March 2022, DCFS filed a section 388 petition to modify the court's orders to require monitored visitation because of mother's continued marijuana use, failure to drug test, unstable housing situation, and untreated mental health issues.  Mother opposed the petition, asking the juvenile court to consider that her situation was now more complicated.  Mother had recently turned 18 and, as a result, her dependency case was closed and she no longer had wraparound services.  The court granted DCFS's section 388 petition in part, allowing mother to continue having unmonitored visits at the caregiver's home as long as the caregiver was present.  The court gave DCFS the discretion to liberalize mother's visits.

In July 2022, the court held a six-month review hearing under section 366.21, subdivision (e).  Because S.G. was under three years old at the time of detention, mother was only entitled to six months of reunification services.  (§§ 361.5, subd. (a)(1)(B), 366.21, subd. (e)(3).)  DCFS's written report recommended that the court terminate reunification services.  Mother opposed the recommendation.  She asked the court to consider her young age, her loss of services as a dependent child when she turned 18, and her loss of family support after her mother (S.G.'s maternal grandmother) moved out of state.

The court found mother had not made substantial progress toward alleviating the causes that had necessitated the removal of S.G. from her custody. Mother had not submitted to drug testing. She had not participated in regular mental health services and individual counseling. She attended some sessions of a substance abuse awareness program for teens, but was discharged for lack of participation. In addition, her visits outside the caregiver's home remained monitored.

However, the court recognized the "multiple challenges" mother faced, such as homelessness, a brief period of incarceration, and the lack of family support. The court further acknowledged mother was a young parent and expressed its belief that mother "has what it takes to reunify with her child." The court therefore extended family reunification services for another six months, again expressly considering "the particular barriers to accessing court-ordered services and maintaining contact with the child faced by minor parents," and that mother had "only recently turned 18."

In January 2023, the court held a combined 12- and 18-month review hearing under sections 366.21, subdivision (f)(1) and 366.22, subdivision (a)(1). By this time, S.G. had been out of mother's custody for over 18 months. Mother asked the court to extend reunification services for another six months. DCFS's and S.G.'s counsel asked the court to terminate mother's reunification services. S.G.'s counsel pointed out that S.G. was initially detained at two months old. He was now almost two years old and also had special needs. S.G.'s counsel reminded the court that the dependency scheme timelines were intended to prevent children from waiting too long for permanency.

The court stated it was "considering [mother's] age. She is a young mom. She was a teen and she was a minor when the child was detained." However, mother failed to consistently drug test, only sporadically attended her substance abuse program and counseling sessions, and did not consistently visit S.G. The court found mother had again failed to substantially comply with the case plan and continuing services would not be in S.G.'s best interest. It determined there was no legal basis to continue reunification services, even after considering the challenges mother faced as a young parent. The court terminated reunification services and set the case for a section 366.26 permanency planning hearing (section .26 hearing).

In May 2023, mother filed a petition pursuant to section 388 asking the court to reinstate reunification services or select legal guardianship as the permanent plan instead of adoption. Mother contended modification was warranted because she had "created a more stable life" for herself by enrolling in drug treatment programs, consistently attending therapy, taking her prescribed psychotropic medications, and visiting her son regularly.

DCFS opposed the request for further reunification services and continued to recommend termination of mother's parental rights. Although mother was "attempting to reengage in her services and cares about her child," she failed to consistently visit S.G. She had not submitted to drug and alcohol testing and was discharged from her drug treatment program in February 2023 for failing to attend for more than 30 consecutive days. DCFS also reported mother continued "to struggle with following through with mental health services and to address mental health treatment, unresolved trauma and/or current, medication

treatment services, and substance abuse awareness and testing." DCFS further noted S.G. attended weekly services "three times per week to assist with speech delay, developmental delays and behavioral concerns," and the agency opined that it was in S.G.'s best interest to have stability in the form of adoption to protect his safety and wellbeing.

The juvenile court considered mother's section 388 petition on the day of the section .26 hearing. After receiving testimony from mother, considering the documentary evidence, and hearing argument from all counsel, the court denied mother's section 388 petition. The court explained that mother's "circumstances are still changing," but they had not changed enough for the court to find it would be in S.G.'s best interest to grant mother additional reunification services. The court proceeded to the section .26 hearing, terminated mother's parental rights, and selected adoption as S.G.'s permanent plan, with the current caregiver as the prospective adoptive parent.

Mother timely appealed.

## DISCUSSION

Mother contends the application of sections 366.26 and 388 to her, as a teenage parent, violated her substantive due process rights.[3] Although mother did not raise this issue below, we

---

[3] At various points in her opening brief, mother describes the class of individuals whose rights are at issue as "young persons," "young people," "young adults," "teen parents," and "minor parents." She also refers to different ages—from teenage years to 25—as benchmarks for "youth" throughout her briefing. We use the phrase "teenage parents" generally to describe this group, or "minor parents" when that term is used by the statute. Since we

exercise our discretion to consider it, as it is a purely legal question, involving no disputed facts, which we review de novo. (*In re C.P.* (2020) 47 Cal.App.5th 17, 24, fn. 5, 27.)

The federal and state Constitutions prohibit states from depriving any person of life, liberty, or property without due process of law.  (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7.)[4]  Substantive due process protects fundamental liberty interests by " 'prevent[ing] government from enacting legislation that is "arbitrary" or "discriminatory" or lacks "a reasonable relation to a proper legislative purpose." ' [Citations.]"  (*Chan v. Judicial Council of California* (2011) 199 Cal.App.4th 194, 201.)

As one court has recognized, "[t]he concept of 'substantive due process' is slippery in its application," and "[w]ith no definite test to determine whether a statute satisfies the 'notions of fairness' which populate the concept of 'substantive due process,' and no definite test to determine whether a statute is 'unreasonable' or 'arbitrary,' courts must proceed cautiously so as not to overstep the boundaries of separation of powers. . . . ' " . . . [A] legislature does not violate due process so long as an enactment is . . . reasonably related to a proper legislative goal. The wisdom of the legislation is not at issue in analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all

find no merit to mother's claim, we need not grapple with the specific age range her arguments might implicate.

[4]      The California Constitution's due process provision "has been held to be identical in scope and purpose with the due process clause of the federal Constitution."  (*Gray v. Whitmore* (1971) 17 Cal.App.3d 1, 20; see *Armstrong v. County of San Mateo* (1983) 146 Cal.App.3d 597, 617, fn. 14.)

8

related ills at once will invalidate a statute." ' [Citations.]" (*People v. Rodriguez* (1998) 66 Cal.App.4th 157, 175.) Further, " 'the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' [Citations.]" (*Reno v. Flores* (1993) 507 U.S. 292, 302.)

We need not break new ground in this case. As we explain below, the California Supreme Court has already largely addressed the fundamental due process issues mother raises in this appeal.

## I. The California Supreme Court Has Rejected Due Process Challenges to the Post-Reunification Dependency Scheme

In 1993, the California Supreme Court decided a pair of cases that raised both procedural and substantive due process challenges to the dependency scheme and, in particular, section 366.26. Although mother does not assert a procedural due process challenge here, both cases provide in-depth analysis of the legislative objectives of sections 366.26 and 388. We therefore consider both decisions in some detail.

In *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242 (*Cynthia D*.), the California Supreme Court addressed a procedural due process challenge to the dependency scheme. The mother argued the statutory framework, including section 366.26, violated due process because it allowed termination of parental rights based on "a finding by a preponderance of the evidence that return of the child to parental custody would create a substantial risk of detriment to the child," rather than requiring a finding by clear and convincing evidence. (*Id*. at p. 250.)

9

To address the argument, our high court reviewed the history and purpose of the legislation enacting the modern dependency scheme. The scheme was part of California's effort to comply with new federal funding conditions that required states to select permanent plans for children "in a timely fashion" if reunification efforts failed. (*Cynthia D.*, *supra*, 5 Cal.4th at p. 246.) In 1982, the California Legislature enacted "a more structured framework" for dependency cases, including a clear and convincing standard for removing children from parental custody, status review hearings, reunification services, and permanency planning hearings for children who could not be returned to a parent within 12 to 18 months. Adoptions, however, were carried out in a separate proceeding in superior court. (*Id.* at pp. 246, 248–249.)

The new process still resulted in "lengthy delays, especially when adoption was selected as the permanent plan." (*Cynthia D.*, *supra*, 5 Cal.4th at p. 247.) Thus, the Legislature, on the recommendations of a task force, revised the statutory scheme to eliminate the separate adoption proceeding "and brought termination of parental rights for dependent children within the dependency process through a selection and implementation hearing pursuant to section 366.26." (*Ibid*.) This hearing required juvenile courts to "only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated." (*Id.* at pp. 249–250, quoting Sen. Select Com. on Children & Youth, SB 1195 Task Force Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988) p. 11 (Task Force Report).) The task force intended " 'to

eliminate duplication between the regular review hearings and the termination hearing. Therefore, the decisions made at the review hearing regarding reunification are not subject to relitigation at the termination hearing. This hearing determines only the type of permanent home.' [Citation.]" (*Cynthia D.*, at p. 250, quoting Task Force Report, *supra*, p. 12.)

Considering this context, our high court rejected the mother's due process challenge to the preponderance of evidence standard at section .26 hearings. With respect to the parent's fundamental liberty interests, the court reasoned that "the purpose of the section 366.26 hearing is not to accumulate further evidence of parental unfitness and danger to the child, but to begin the task of finding the child a permanent alternative family placement. By the time dependency proceedings have reached the stage of a section 366.26 hearing, there have been multiple specific findings of parental unfitness." (*Cynthia D.*, *supra*, 5 Cal.4th at p. 253.) As a result, "[a] parent whose conduct has already and on numerous occasions been found to grievously endanger his or her child is no longer in the same position as a parent whose neglect or abuse has not so clearly been established. At this point the interests of the parent and child have diverged, and the child's interest must be given more weight. Because section 366.26 contemplates termination of parental rights only when there is clear and convincing evidence that the child is likely to be adopted, the child's fundamental interest in the opportunity to experience a stable parent-child relationship is very much at stake at the section 366.26 hearing. In this setting, a burden of proof standard that tilted the evidentiary scales in favor of the parent . . . would have the

11

inevitable effect of placing a greater risk on the child than on the parent." (*Id.* at p. 254.)

The court further reasoned: "Considered in the context of the entire process for terminating parental rights under the dependency statutes, the procedure specified in section 366.26 for terminating parental rights comports with the due process clause of the Fourteenth Amendment because the precise and demanding substantive and procedural requirements the petitioning agency must have satisfied before it can propose termination are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents.  At this late stage in the process the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must now align itself." (*Cynthia D.*, *supra*, 5 Cal.4th at p. 256.)

*Marilyn H.*, *supra*, 5 Cal.4th 295, addressed a substantive due process challenge to section 366.26.  In the lower court proceedings, the juvenile court terminated reunification services and set a section .26 hearing after finding, at the 18-month hearing, that returning the two children to their mother would create a substantial risk of detriment to the minors.  (*Id.* at p. 299.)  The mother subsequently reunified with another child in a different dependency proceeding.  (*Ibid.*)  Although the mother did not file a section 388 petition, at the section .26 hearing she asked the court to return her two children to her custody, alleging her reunification with a different child was a changed circumstance.  (*Ibid.*)  The juvenile court concluded it could not consider the mother's request because it was limited to

12

determining "whether [the] minors were to be adopted, placed in long-term foster care, or placed under guardianship." (*Ibid*.) The court selected legal guardianship as the permanent plan. (*Id*. at pp. 299–300.) The mother challenged the order by arguing that "to the extent the statutes preclude consideration of return to parental custody at the section 366.26 hearing, those provisions violate her and her children's due process rights under the federal and state Constitutions." (*Id*. at p. 300.)

The California Supreme Court held section 366.26 did not violate the mother's due process rights. Similar to its decision in *Cynthia D.*, the court reviewed the history of the dependency statutes and the Legislature's intent to expedite a minor's permanent placement by eliminating a separate action for adoption and limiting the scope of the section .26 hearing. (*Marilyn H.*, *supra*, 5 Cal.4th at p. 303.) As the court observed, because "the sole purpose of the section 366.26 hearing is to select and implement one of the listed permanent plans" in the statute, "the focus of the case shift[s] away from reunification to providing a permanent, stable placement for the children." (*Id*. at p. 304.)

With respect to mother's substantive due process claim, the *Marilyn H.* court held: "A parent's interest in the companionship, care, custody and management of his children is a compelling one, ranked among the most basic of civil rights. [Citation.] Likewise, natural children have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that [which] allows the caretaker to make a full emotional commitment to the

13

child.  [Citation.]  The interests of the parent and the child, therefore, must be balanced.

"Substantive due process prohibits governmental interference with a person's fundamental right to life, liberty or property by unreasonable or arbitrary legislation.  [Citation.]  In substantive due process law, deprivation of a right is supportable only if the conduct from which the deprivation flows is prescribed by reasonable legislation that is reasonably applied; that is, the law must have a reasonable and substantial relation to the object sought to be attained.  [Citation.]

"The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.  [Citations.]  Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.  [Citations.]  The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful.  [Citations.]  This interest is a compelling one.  [Citation.]  The state's interest requires the court to concentrate its efforts, once reunification services have been terminated, on the child's placement and well-being, rather than on a parent's challenge to a custody order.  Requiring the parent to petition the court to hear a challenge to a custody order after reunification services have been terminated

14

does not violate substantive due process." (*Marilyn H.*, *supra*, 5 Cal.4th at pp. 306–307.)

The court further found that section 388, which allows a parent to seek reinstatement of reunification services upon a showing of changed circumstances, further supported the validity of section 366.26. Section 388 "accommodate[s] the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) In light of the " 'escape mechanism' " available in section 388, the court concluded section 366.26 does not violate parents' substantive due process rights "merely because the juvenile court's dispositional options do not include return to parental custody." (*Id.* at pp. 309, 310.)

Since our high court's decisions in *Cynthia D.* and *Marilyn H.*, courts have applied their analysis to due process challenges to the dependency statutes arising in different contexts, including when a parent challenges a juvenile court's decision to terminate reunification services. (See, e.g., *In re Jasmon O.* (1994) 8 Cal.4th 398, 415–422 (*Jasmon O.*); *Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 611–613 (*Daria D.*); *In re Alanna A.* (2005) 135 Cal.App.4th 555, 566; *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 117–118.)

## II. Section 366.26 Did Not Violate Mother's Substantive Due Process Rights

### A. *Marilyn H.* applies to this case

Mother fails to meaningfully distinguish *Marilyn H.* She argues that teenage parents need more time to reunify with their children, but she does not challenge the statutory time limits on reunification services available to her as a minor and teenage

parent prior to the termination of reunification services.[5] Instead, as the mother argued in *Marilyn H.*, mother contends that after reunification services have been terminated, the court should still be required to consider factors about the parent that may make it possible in the future for the child to safely return to parental custody—in this case, mother's youth. Mother also argues that the juvenile court's inability to reject a permanent plan of adoption at the section .26 hearing based on mother's youth violated her right to due process. The mother in *Marilyn H.* similarly contended that the limitation on the court's options at the section .26 hearing which excluded return to a parent violated her substantive due process rights. The mother's arguments in *Marilyn H.*, like mother's arguments in this case, all essentially challenged the shift in the focus of the dependency proceedings away from reunification with the parents to permanence and stability for the child with a different caretaker. The *Marilyn H.* court rejected the mother's arguments, concluding that shift of focus does not violate a parent's due process rights. We are bound by that decision. (*Auto Equity*

---

[5] Indeed, mother did not file a petition for extraordinary writ review of the juvenile court's orders terminating her reunification services and setting the section .26 hearing. (§ 366.26, subd. (l).) In keeping with the limited nature of her arguments, mother's proposals for remedying the due process violation she alleges relate only to the selection of a permanent plan and termination of parental rights. Mother suggests this court should hold that: the juvenile court must apply a presumption favoring legal guardianship instead of adoption when a teenage parent is involved; a section .26 hearing may not be held until a teenage parent is over 21 years old; or the teenage parent's interest in the care and custody of the child must predominate instead of the needs of the child for permanence and stability.

16

*Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57
Cal.2d 450, 455 (*Auto Equity*).)

Mother asserts *Marilyn H.* is inapplicable because the
relevant scientific and psychological research about juvenile
brain development was not available when the case was decided,
and, further, the issue of teenage parents was not presented to
the court.  She contends that since teenagers' ongoing
neurological development gives them a greater capacity to change
than older adults, due process requires that a teenage parent's
fundamental interest in the care and custody of a child must
remain paramount.

We disagree.  Mother's argument ignores the fundamental
holding of *Marilyn H.*, which is that once reunification efforts
have been exhausted, turning the court's focus to the compelling
state interest of achieving permanence and stability for the
dependent child does not violate a parent's due process rights.
Notwithstanding the parent's circumstances, the post-
reunification dependency scheme's shift of focus is substantially
and reasonably related to the compelling state interest in
protecting the welfare of dependent children.

As the *Cynthia D.* court explained, once reunification
services are terminated, subsequent hearings are not concerned
with finding a parent unfit.  The shift of focus from reunification
to permanence is a recognition that reunification efforts have not
been successful, and the state must now prioritize its duty to
protect abused and neglected children by expediently facilitating
a permanent and stable placement.  Mother fails to articulate
why or how a teenage parent's developmental immaturity or
greater capacity for change renders it constitutionally
impermissible for the law to take steps to meet the state's

17

obligation to protect dependent children after reunification efforts with a teenage parent have failed.

**B.     Under the *Marilyn H.* analytical framework, there was no substantive due process violation**

Moreover, even if mother's status as a teenage parent undermined the applicability of the *Marilyn H.* court's ultimate conclusion, the case still models the analysis we must follow to evaluate mother's arguments.  (*Daria D.*, *supra*, 61 Cal.App.4th at p. 612.)  That analysis indicates that the section 366.26 proceedings did not violate mother's due process rights.

*Marilyn H.* explained that the deprivation of a fundamental right "is supportable only if the conduct from which the deprivation flows is prescribed by reasonable legislation that is reasonably applied; that is, the law must have a reasonable and substantial relation to the object sought to be attained." (*Marilyn H.*, *supra*, 5 Cal.4th at pp. 306–307.)[6]  The *Marilyn H.* court

---

[6]     Since the California Supreme Court has announced the applicable standard to review a parent's challenge to the constitutional sufficiency of the post-reunification procedures in sections 366.26 and 388, we must reject mother's argument that we should instead apply strict scrutiny.  Mother supports her argument only with out-of-state cases and Justice Thomas's concurrence in *Troxel v. Granville* (2000) 530 U.S. 57.  Neither out-of-state authorities, nor a concurrence of one Supreme Court justice opining on an issue not decided by a majority of the Court, is binding precedent.  (*Maryland v. Wilson* (1997) 519 U.S. 408, 412–413).  Nor are we permitted to follow such authorities as persuasive when the California Supreme Court has reached a different result on the issue.  *Auto Equity* again applies here: "The decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California."

18

further reasoned that "[i]n evaluating whether a parent is denied due process by limiting the issues at a section 366.26 hearing, it is important to examine the entire statutory scheme." (*Marilyn H.*, at p. 307.) We need not repeat the *Marilyn H.* and *Cynthia D.* courts' examination of the general dependency scheme (*id.* at pp. 301–304, 307–309; *Cynthia D., supra,* 5 Cal.4th at pp. 246–250), but there are additional aspects of note specific to teenage parents like mother.

At various points before a section .26 hearing, the law requires juvenile courts to give special consideration to teenage parents, who, like mother, are themselves under the jurisdiction of the juvenile court.[7] That consideration begins with attempts to prevent the child of a minor parent from ever becoming a juvenile dependent.

---

(*Auto Equity, supra,* 57 Cal.2d at p. 455.) However, we also note that given the compelling state interests involved (*Marilyn H., supra,* 5 Cal.4th at p. 307) and California's narrowly crafted dependency scheme, we would reach the same conclusion using strict scrutiny.

[7]  Section 16002.5, subdivision (h) defines a "minor parent" as "a dependent child who is also a parent." Section 361.8, subdivision (d) incorporates that definition. Although not specific to young adult parents, the law also includes special provisions for youths who reach the age of majority while they are dependents of the juvenile court. This system of extended foster care allows young adults to voluntarily continue receiving services as "nonminor dependents." (§§ 391, 11403, subd. (a).) Many of the provisions regarding minor parents also apply to nonminor dependent parents. The record does not indicate that mother participated in extended foster care.

19

The Legislature has expressed its intent "to maintain the continuity of the family unit and to support and preserve families headed by minor parents" by placing them together in "as family-like a setting as possible . . . ." (§ 16002.5.)  The law mandates that a child welfare agency provide minor parents with access to services "that are specifically targeted at supporting, maintaining, and developing both the parent-child bond and the dependent parent's ability to provide a permanent and safe home for the child." (*Id.*, subd. (a).)  Minor parents must also be given the opportunity to participate in activities that will further their own development, such as attending school.  (*Id.*, subd. (c).)

Foster care placements for minor parents and their children "shall demonstrate a willingness and ability to provide support and assistance to minor parents . . . and their children, shall support the preservation of the family unit, and shall refer a minor parent . . . to preventive services to address any concerns regarding the safety, health, or well-being of the child, and to help prevent, whenever possible, the filing of a petition to declare the child a dependent of the juvenile court pursuant to Section 300." (§ 16002.5, subd. (e).)

The statutory scheme further imposes stricter standards on courts and agencies before making findings or taking actions adverse to minor parents.  Social workers must employ "a strengths-based approach" to support minor parents, even when they are investigating whether a minor parent's child is at risk of abuse or neglect.  (§ 361.8, subd. (b)(4).)  A juvenile court may not find the child of a minor parent is "at risk of abuse or neglect solely on the basis of information concerning the [minor parent's] placement history, past behaviors, or health or mental health diagnoses occurring prior to the pregnancy . . . ." (*Id.*, subd. (a).)

If the court removes a child from a minor parent's custody, the court cannot deny reunification services to the minor parent solely because the parent failed to reunify with another child or had parental rights to another child terminated. (§ 361.8, subd. (b)(1), § 361.5, subd. (b)(10), (11).) At the six-month, 12-month, and 18-month review hearings, the court must take into account "the particular barriers to a minor parent" when considering parents' efforts or progress and the extent to which they availed themselves of services. (§§ 366.21, subds. (e)(1) & (f)(1)(C), 366.22, subd. (a)(1).) The juvenile court in this case expressly referenced this provision and considered the barriers mother faced, even though she was no longer a minor by the time of the first review hearing.

At the 18-month review hearing, the juvenile court may continue reunification services for another six months for a parent who was a minor parent at the time of the initial hearing and who has demonstrated "significant and consistent progress in establishing a safe home for the child's return . . . ." (§ 366.22, subd. (b)(1).) These young parents may thus receive a total of 24 months of reunification services.

If the child welfare agency seeks termination of parental rights over a child born to a minor parent, it must show reasonable efforts were made to provide remedial services to prevent the removal of the child from the minor parent, including resources available to the child and minor parent's "extended family," and that those efforts were unsuccessful. (§ 361.8, subd. (b)(2), (3).)

Thus, for mother, who was a minor and a juvenile dependent when S.G.'s dependency case began, the dependency scheme expressly took into account factors related to her youth at

21

several stages of the proceedings prior to the termination of reunification services.  The juvenile court repeatedly referenced these factors in mother's case.

We disagree with mother that these youth-focused efforts are irrelevant because "the brain science considerations are too fundamental and the termination of parental rights too serious and permanent to conclude that omission of those considerations at the section 388 and permanency hearing is constitutional because other aspects of the scheme provide some protections." The *Marilyn H.* court determined section 366.26 and section 388 should not be viewed in isolation in determining whether they violate a parent's substantive due process rights.  Considering the dependency scheme as a whole, including the safeguards that address and protect the fundamental rights of adult parents and of minor parents like mother, shifting the focus to the needs of the child for permanency and stability once reunification services are terminated is not unreasonable, arbitrary, or fundamentally unfair.[8] (*Marilyn H.*, *supra*, 5 Cal.4th at pp. 307–309.)

Irrespective of mother's youth, we find no basis to depart from the *Marilyn H.* court's conclusion that "[s]ections 366.26 and

_____

[8]     *Marilyn H.* described safeguards such as a parent's entitlement to up to 18 months of reunification services; regular review hearings; the statutory presumption that the child will be returned to parental custody at the disposition hearing and at each review hearing; a parent's entitlement to the assistance of a social worker and an attorney throughout the proceedings; and the requirement that the juvenile court continue a child's removal from parental custody only after repeatedly determining that return to the parent would be detrimental.  (*Marilyn H.*, *supra*, 5 Cal.4th at p. 308.)  All of these safeguards applied in mother's case.

22

388, when construed together and with the legislative scheme as a whole, are reasonable and bear a substantial relation to the objective sought to be attained. The parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority. Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status. Thus, both substantive and procedural due process are satisfied." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

## III. Neither the Legislative Preference for Adoption Nor Section 388's Changed Circumstances Requirement Violated Mother's Due Process Rights

Mother also argues the legislative preference for adoption violated her due process rights as a teenage parent. Yet, the statutory preference also bears a reasonable and substantial relation to the legislative objectives of balancing each party's competing interests at the permanency planning stage. "The Legislature has . . . determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The preference itself has a clear reasonable and substantial relation to the proper legislative objective of providing abused or neglected children with permanence and stability when they cannot be reunified with a parent. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573;

23

§ 366.26, subd. (c)(1); *In re Heather B.* (1992) 9 Cal.App.4th 535, 546 (*Heather B.*); accord, *In re Tamneisha S.* (1997) 58 Cal.App.4th 798, 804.) A parent's youth does not change or lessen a child's need for permanence and stability.

Moreover, "[i]t is critical to secure stable placement for a dependent child as soon as possible, consistent with the parents' rights. [Citation.] Conversely, a child's need for permanency and stability cannot be delayed for an extended time without significant detriment." (*Daria D., supra,* 61 Cal.App.4th at p. 611.) Mother suggests that teenagers' parental rights should not be terminated until they reach an age of relative maturity, such as over 21. However, this proposal would result in children potentially lingering in foster care without a permanent plan for several years. In *Marilyn H.,* the court explained that "[c]hildhood does not wait for the parent to become adequate," and legislative changes were made specifically to prevent adoptable minors from having to " 'wait months and often years for the opportunity to be placed with an appropriate family on a permanent basis.' " (*Marilyn H., supra,* 5 Cal.4th at pp. 310, 303.) Mother fails to establish that the legislative preference for adoption or the requirement that the permanent plan be selected and implemented expeditiously lacks a substantial relation to a proper legislative objective. (*Heather B., supra,* 9 Cal.App.4th at pp. 558–559.)

The same is true of section 388's requirement that a parent demonstrate *changed* circumstances before the juvenile court may grant a petition seeking further reunification services or a return to parental custody at the section .26 hearing. Eliminating the requirement of changed circumstances in favor of a showing that a teenage parent has the potential to change, as

24

mother appears to suggest, would create duplication and invite delay in permanency planning, subordinating the needs of the child to the interests of the parent.  This would undermine the purpose of section 388 as a safeguard against "last-minute . . . attempt[s] by a parent to delay permanency for" children who have already spent considerable time in an unsettled living situation.  (*Marilyn H.*, *supra*, 5 Cal.4th at p. 310.)

The absence of a requirement that the court also consider a teenage parent's potential for future change does not render the law arbitrary, discriminatory, or lacking a reasonable relation to a proper legislative purpose.  The section 388 changed circumstance requirement, when viewed in connection with the rest of the dependency scheme, provides a teenage parent "due process and fundamental fairness while also accommodating the child's right to stability and permanency."  (*Marilyn H.*, *supra*, 5 Cal.4th at p. 307.)

## IV.    Eighth Amendment Jurisprudence Regarding Juvenile Offenders Does Not Apply to the Dependency Context

To support her arguments, mother relies on several United States and California Supreme Court decisions finding severe criminal penalties unconstitutional when imposed on juvenile offenders.  She asserts the reasoning of these decisions "applies with equal force to teen parents seeking to reopen services or seeking to retain their parental rights." We disagree.  While the underlying scientific and psychological research may describe youth irrespective of the context, mother's argument ignores that the objectives and interests of the criminal justice system are vastly different from those of the juvenile dependency system.

The cases mother cites concern the constitutionality of the most severe criminal punishments and sentencing schemes for juvenile offenders under the Eighth Amendment to the United States Constitution. (*Roper v. Simmons* (2005) 543 U.S. 551, 575 (*Roper*) [death penalty for offenders under 18 was excessive under Eighth Amendment]; *Graham v. Florida* (2010) 560 U.S. 48, 79 (*Graham*) [Eighth Amendment forbids sentencing juveniles to life without parole for nonhomicide offenses]; *Miller v. Alabama* (2012) 567 U.S. 460, 489 (*Miller*) [mandatory scheme sentencing all juvenile offenders convicted of homicide to life without parole violated the Eighth Amendment]; *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) [110-years-to-life sentence for a juvenile offender for a nonhomicide offense constitutes cruel and unusual punishment].)[9]

The Eighth Amendment prohibits cruel and unusual punishments. " '[E]mbodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to

---

[9] We note that in this area of criminal law, the United States Supreme Court has distinguished between minors and offenders who are legal adults. (See, e.g., *Roper, supra,* 543 U.S. at pp. 555–556.) As a result, courts have concluded that despite research indicating that young adults continue to experience significant neurological development into their early 20s, imposing the most severe punishments on young adults does not violate the Eighth Amendment. (*People v. Tran* (2022) 13 Cal.5th 1169, 1234–1235; *In re Williams* (2020) 57 Cal.App.5th 427, 437–439.) Thus, even if the reasoning of cases concerning juvenile offenders applied equally to dependency cases—which we conclude it does not—that reasoning would not necessarily assist mother in this case, since she was a legal adult by the time of the section .26 hearing.

[the] offense." [Citation.]' [Citations.]" (*In re Coley* (2012) 55 Cal.4th 524, 538, quoting *Graham*, *supra*, 560 U.S. at p. 59.) " '[T]he concept of proportionality is central to the Eighth Amendment . . . .' " (*In re Coley*, at p. 538, quoting *Graham*, at p. 59.)

The Eighth Amendment analysis thus requires consideration of the penological justifications for imposing a harsh sentence. These typically include the defendant's moral culpability; the defendant's prospects for reform; retribution, which is related to blameworthiness; deterrence; incapacitation of an incorrigible defendant; and rehabilitation. (See, e.g., *Miller*, *supra*, 567 U.S. at pp. 472–473; *Roper*, *supra*, 543 U.S. at pp. 571–573.) The Supreme Court concluded in a series of cases that attributes of the juvenile brain such as "transient rashness, proclivity for risk, and inability to assess consequences" are relevant to determining the proportionality of punishment because they "diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Miller*, at p. 472.)

In contrast, the state's objective in the juvenile dependency system is not to punish parents for their conduct. (*In re Sade C.* (1996) 13 Cal.4th 952, 991.) Instead, it is to protect children from abuse and neglect and, after efforts to reunify the family have been unsuccessful, to ensure children have stable and permanent placements. (*Marilyn H.*, *supra*, 5 Cal.4th at p. 307.) After the juvenile court asserts dependency jurisdiction over a child, the court's decision at each review hearing is based on its assessment of harm or risk of harm to the child, not on the moral culpability of the parent. Once reunification services are terminated, the

27

proceedings that follow are not concerned with parental unfitness. (*Cynthia D.*, *supra*, 5 Cal.4th at p. 253.)

While in criminal matters the system of punishment focuses on the offender, in juvenile dependency cases, a single system must protect and address the fundamental rights of individual parents *and* individual children. (*Marilyn H.*, *supra*, 5 Cal.4th at p. 307.) Mother contends criminal courts must still balance a juvenile offender's dangerousness to "others" with its decision to impose mitigated punishments in recognition of an offender's youth. Yet, the decisions mother cites do not stand for this proposition and did not engage in any balancing of individual, competing rights. The courts limiting the criminal penalties children may face categorically held that because of the unique attributes of youth, severe punishments did not serve legitimate penological goals and were grossly disproportionate to the crimes committed. (*Roper*, *supra*, 543 U.S. at p. 571; *Graham*, *supra*, 560 U.S. at pp. 72–73; *Miller*, *supra*, 567 U.S. at pp. 476–477; *Caballero*, *supra*, 55 Cal.4th at pp. 266–268.)

Shifting the focus from reunification to permanency, requiring that a parent demonstrate changed circumstances to disrupt that shift of focus, and preferring adoption as a permanent plan, are all legislative choices that significantly impact a teenage parent's rights, but their goal is not to punish the parent. They instead reflect a policy decision to focus on children's rights in proceedings where expediency is critical to the protection of their interests. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 674 ["In deciding what services or placement are best for the child, time is of the essence"].) There is no basis to conclude that a child's need for permanence and stability becomes less compelling when the child's parent is still experiencing

significant neurological development. Decisions invalidating criminal penalties for juvenile offenders under the Eighth Amendment therefore apply standards and consider interests that are inapposite in the dependency context.[10]

Finally, we note that mother fails to even make a pretense of arguing that any of the changes to the dependency scheme she proposes would promote the welfare of dependent children. She does not mention that prolonged dependency proceedings are detrimental to dependent children. She asserts that her rights as a teenage parent should have remained "paramount" after reunification efforts failed, without acknowledging S.G.'s fundamental rights as a dependent child. We are not free to disregard the dual interests at stake. "Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent." (*Jasmon O.*, *supra*, 8 Cal.4th at p. 419.) Certainly, the Legislature could weigh the competing interests differently and prescribe further differential treatment for minor and young adult parents in the dependency scheme. But there is no basis for us to conclude that the balance it has currently drawn as reflected in section 366.26, section 388, or the legislative preference for adoption, is arbitrary, discriminatory, or bears no reasonable relation to well-established and proper legislative objectives.

---

[10] Similarly, mother refers to several non-criminal contexts in which state and federal laws extend services to young adults after they turn 18 or impose age minimums at 21. She does not explain, however, how a "consensus" that young adults continue to experience neurological development invalidates the Legislature's balancing of competing interests between parents and children in the dependency post-reunification context.

## DISPOSITION

The juvenile court orders are affirmed.

**CERTIFIED FOR PUBLICATION**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.